```
UNITED STATES DISTRICT COURT                          FILED
EASTERN DISTRICT OF NEW YORK                       IN CLERK'S OFFICE
                                                 U.S. DISTRICT COURT E.D.N.Y
```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------x
BARBARA JUPITER, as Executrix of
the Estate of Warren Jupiter, and
BARBARA JUPITER, Individually,

           Plaintiff,

-against-

UNITED STATES OF AMERICA,

           Defendant.
----------------------------------------------x

MEMORANDUM AND ORDER
05 CV 4449 (ILG)(RML)

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ DEC 14 2010 ★

BROOKLYN OFFICE

GLASSER, United States District Judge:

    The plaintiff has moved this Court for an Order that would preclude the testimony of proposed expert witness Dr. Abraham L. Halpern. Dr. Halpern is a medical doctor licensed to practice in the State of New York, and certified in psychiatry by the American Board of Psychiatry and Neurology. His qualification as an expert is not disputed. What is disputed is the conclusion, and the basis for it, reflected in his proposed Report.

    It will be assumed that the reader is familiar with the malpractice claimed to have caused the injuries to, and eventual death of, Warren Jupiter, for which redemption is sought in this action. The defendant seeks to offer Dr. Halpern's opinion that Mr. Jupiter's narcissistic personality disorder (NPD) impeded the defendant's effort to treat him. The import of his opinion is not readily divined nor is the purpose for which it is sought to be offered. Is it intended to convey that Mr. Jupiter's personality disorder was a contributing factor to his death?; that his personality disorder impelled him to starve himself to death?; that it interfered with, but did not otherwise have a significant impact on the events which propelled them to this courthouse? The essence of the plaintiff's

objection to the admissibility of his testimony is the very questionable foundation upon which his opinion has been formed.

Dr. Halpern's Report, dated February 24, 2010, begins with a listing of the materials he reviewed in arriving at his opinion. That listing, single spaced, covers more than half of the first page of his report and references reports going as far back as 1987; depositions of at least 15 persons; letters between plaintiffs' counsel and the DVA Office of General Counsel; the complaint and amended complaint marking the commencement of this lawsuit and others itemizing which will add little to those already referenced. The purpose of that listing is to permit the observation that questions may be asked whether many of those are "of a type reasonably relied upon by experts in [his] field informing opinions or inferences upon the subject" Rule 763, Fed. R. Ev. Other questions may be raised regarding relevance, e.g., "reports of similar pain and suffering award cases" and hearsay. See, e.g., Hutchinson v. Groskin, 722 F.2d 722 (2d Cir. 1991). Those questions, answers to which are not provided in, nor can they be gleaned from his Report may, in and of themselves, provide a sound basis for precluding his testimony, but are not being regarded in arriving at the determination of this motion. That determination is made upon an evaluation of the substantive context of the Report and the Opinion it offers as serving the purpose for which it may be received, namely, to "assist the tries of fact to understand the evidence or to determine a fact in issue" Fed. R. Ev. 702.

The first full paragraph on page 2 of his Report is devoted to recounting the less than idyllic relationship Mr. Jupiter had with his wife and children taken almost entirely from the records of and letters to a Dr. Gorkin.

2

His diagnosis of narcissistic personality disorder is based virtually in its entirety on the records of Dr. Gorkin, which are twenty years old. One example of the DSM criteria manifested by Mr. Jupiter - a sense of entitlement - cited by Dr. Halpern is "a letter dated 12/17/93 by the VA Medical Administration Services: 'Mr. Jupiter has requested through Senator Daniel P. Moynihan's office approval of his Fee Basis treatment to be one visit per week.'" The Court will not comment upon the absurdity of that reference as an indicator of a "sense of entitlement" beyond stating that it alone would serve to grant this motion (Halpern Report p.3). His references to conduct manifesting his need to "exhibit power over others" is of a piece with his letter to Senator Moynihan, viz.: "An example of his wish to demonstrate his power over authority figures was his tactic of 'asking to go back to bed when placed in a wheelchair and asking to be put in a chair when in bed.'" (Halpern Report p.4). The significance of the very next paragraph in relation to this eludes me: "He showed quite the opposite behavior when it came to fulfilling his self-serving wishes. Prior to his hospitalization, he would go to Atlantic City where the casino operators gave him special privileges. Except for winning $200 on one occasion, he invariably lost large amounts of money putting his family in financial peril." The basis for this are references to Dr. Gorkin's notes made in 1994, citations to which were omitted.

The opinion that Mr. Jupiter had an NPD is, ostensibly, derived from the Diagnostic and Statistical Manual of Mental disorders (DSM - IV- TR 301.81), which list the criteria - at least five of which should be found to make that diagnosis. Dr. Halpern's Report is vague as to which five he relied on. A reading of the criteria which are set out in a footnote on page 3, brings to mind an observation of Professor Jay Katz

of the Yale Law School, who was also an eminent psychiatrist, quoted in <u>United States v. Toniero</u>, 570 F. Supp. 721, 733 (D.C. Ct. 1983):

> If you look at DSM-III in terms of its classification all of us under one rubric or another of mental disorder
>
> \* \* \*
>
> I haven't studied DSM-III as carefully, but under DSM-II I called myself a psycho-thymic personality. That was the diagnosis I liked for myself because it says, among other things, that this is a person who . . . at times [is] a little bit happy, at other times . . . a little bit sadder, and that the happiness and sadness is also affected by external circumstances.
>
> Well, I'm a fit candidate for that diagnosis. <u>You can find a diagnosis for anyone</u> (in DMS-III). (Emphasis in the text.)
>
> A parsing of DSM-IV may qualify a reader for a similar diagnosis.

See also <u>United States v. DiDomenico</u>, 985 F.2d 1159. 1161 (2d Cir. 1993).

Dr. Halpern acknowledged that Mr. Jupiter was cleared for surgery by a psychiatric evaluation. That clearance was required as a pre-condition of bariatric surgery. The reason for it, as explained by Dr. Weinshel, the defendant's witness, was "There are a lot of patients who have eating disorders that make them challenging to operate on and so for some of the procedures, you have to make a decision whether or not to do a restrictive operation. . . .And that should depend on a good understanding of the patient and their pathology, their psychopathology and their psychiatric environment if you will." Tr. 265. Dr. Thomas Gauge, the defendant's expert, also testified to the importance of a psychiatric clearance prior to that surgery. Tr. 480. No indication of the significance of that clearance beyond acknowledging it in arriving at his conclusion is evident in his Report.

If, indeed, the purpose to be served by offering his opinion (which is nowhere

stated, to be held with a reasonable degree of medical certainty) is to establish that his rejection of food was to starve himself to death and was the product of a narcissistic personality disorder, is to ignore the record. A recitation of every record reference to the relationship between the surgery and its aftermath and his inability to eat would needlessly burden this opinion and a few would surely suffice.

At p. 86 of the medical record, plaintiff's exhibit 1A, the following entry is found: The patient "complains of decreased appetite ever since his surgery with further decrease in the past 5 weeks so that he was disgusted at seeing his favorite foods; that his hamburgers and french fries and had to spit out any food that is put in his mouth . . . Predominant complaint is lack of appetite." Tr. at 77-78.

Dr. Mandell, the defendant's expert, testified that after surgery, Mr. Jupiter had an inability to eat. He stated that just the thought of food made him nauseated and that an intra-abdominal infection may be one of the causes why he wasn't eating. He agreed that anorexia - not eating or repulsion to food - is one of the universal signs of intra-abdominal infection. Tr. 661, 692, 694.

Dr. Gabriel, the defendant's expert, acknowledged that it was reasonable to look for an occult infection as the cause for the patient's decreased appetite. Tr. 961[1]

The foregoing assessment of the Report of Dr. Halpern and his opinion drives the Court to conclude that the motion to preclude his testimony must be granted. It will not

---

[1] See also the testimony of Dr. Randall, Tr. 49, 51, 75, 79, 81-82; Dr. Telzak, Tr. 197, 261; Dr. Weinshel, Tr. 278, 279, 280; Dr. Mueller, Tr. 434-35; Dr. Gabriel, Tr. 876-77.

5

in the slightest degree assist me, as the trier of the facts to understand the evidence or to determine a fact in issue.

SO ORDERED.

Dated:      Brooklyn, New York
            December 13th, 2010

                                                            S/ILG
                                                _____
                                                I. Leo Glasser