UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------x
BARBARA JUPITER, as Executrix of
the Estate of Warren Jupiter, and
BARBARA JUPITER, Individually,

                    Plaintiff,

    -against-

UNITED STATES OF AMERICA,

                    Defendant.
---------------------------------------------------x

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ DEC 20 2012 ★
**BROOKLYN OFFICE**

MEMORANDUM AND ORDER
05 CV 4449 (ILG)(RML)

GLASSER, United States District Judge:

    What follows are the Court's findings of fact and conclusions of law following a bench trial over a period of seven days during which testimony was elicited from fourteen witnesses and a record transcript in excess of eleven hundred pages was created. Received in evidence as exhibits were medical records and reports of approximately 6,000 pages and multiple anatomical diagrams and images.

    The action was commenced against the United States Department of Veterans Affairs (VA) by Barbara Jupiter as Executrix of the Estate of Warren Jupiter (Jupiter), who is alleged to have sustained personal injury and pain and suffering prior to his death caused by the claimed medical malpractice of the defendant's agents and employees while a patient at the hospital of the VA. His wife, Barbara, asserted a claim for her loss of consortium and the wrongful death of her husband. She announced that she discontinued the loss of consortium claim at the outset of the trial. Remaining then, is Jupiter's claim and the claim of his surviving children for the loss of his support, guidance and nurture they suffered by his wrongful death. The action is brought pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2678 conferring

jurisdiction upon this Court to entertain this action.

The evidence adduced at trial fell primarily from the lips of a galaxy of medical experts called by both sides - surgeons with a specialty in bariatric surgery; doctors whose specialty was infectious diseases, gastroenterology, interventional radiology, internal medicine, nutrition and anatomical and clinical pathology. Testimony was also elicited from a radiologic technologist and a witness who had earned a PhD degree in clinical nutrition.

The unfolding of events began prior to April 28, 2003, when the decedent, Warren Jupiter, a man whose quality of life was diminished by his lifelong obesity, determined to address that condition head on by electing to undergo weight reduction or bariatric surgery at the Manhattan campus of the New York Veterans Administration Hospital (NYVA). He was admitted to that hospital on April 22nd, 2003 and after being found psychiatrically fit to endure the operation and the known post-operative recuperative protocol, Tr. 25, 480. Roux-en-Y gastric bariatric surgery was performed on April 28, 2003.

Dr. Sheldon Randall, a general surgeon with a specialty in bariatric surgery, was the plaintiff's first witness who, with the aid of plaintiff's exhibits 8A-8H and relevant references to the entire 6,000 page medical record received in evidence as plaintiff's Exhibit 1, explained how the Roux-en-Y operation is performed. No attempt will be made to replicate that explanation replete as it necessarily was, with the technical medical terminology it required.

One step in that operation, it is claimed, was a stunning departure from the accepted practice of performing bariatric surgery – the removal of the distal stomach by

the operating surgeon, Dr. Thomas Gouge, the government's principal witness.  Dr. Randall, who performed over 6,000 bariatric surgeries, testified to having "looked at different historical books" and could find no reference to the removal of the distal stomach as a standard component of bariatric surgery, Tr. at 27, and that it was his opinion, with reasonable certainty, that there was no surgical reason for removing it. Tr. 37-38.  He explained that the basis for that opinion was the positive post-operative management opportunities of which Jupiter was deprived by the removal of that organ. Tr. 38-39.

Specifically, the removal of the distal stomach precluded the ability to provide needed nutrition to Jupiter by placing a feeding tube directly into the gastrointestinal system and thus avoid the danger that would accompany providing such nutrition intravenously, through the large blood vessels by what was described as PICC lines. That necessitated alternative with its significant risk of infection did, in the event, cause the infection of Jupiter's brain and ultimately his death.  That sequence of cause and effect was acknowledged by the defendant's witnesses, namely, Dr. David Seres, Tr. 817; Dr. Hillel Bryk, Tr. 766; Dr. William Mandell, Tr. 665; Dr. Nick Gabriel, Tr. 888; and by the plaintiff's expert, Dr. Edward Telzak, Tr. 238.

It is important to note that Dr. Nick Gabriel, the defendant's expert, was in full agreement with Dr. Randall although his agreement, elicited on his cross-examination, was not easily obtained as the record plainly reveals:

> Q.     . . . Do any of them (previously named authorities)
>        advocate taking the distal stomach out of the patient?
>
> A.     In that procedure, no.

3

Q.      And the reason for it, doctor, is . . . if you have a

problem post-operatively and you have to feed the

patient, . . . you go right to where the stomach would

have been and you put [a feeding tube] in there . . .

isn't that true?

A.      Yes, that is done.

Q.      So by removing the stomach, you are depriving the

subsequent surgeon of being able to feed a patient by

direct enteral feeding, isn't that true?

A.      There is 22 to 25 feet of enteral possibilities.

Q.      Isn't it true, doctor, that the reason – one of the

reasons the distal stomach is left in place operatively

is to permit enteral feeding if nutrition is needed, isn't

that the reason?

A.      It is, absolutely.

Q.      Was there any explanation of (sic) the record as to

why Dr. Gouge or the resident removed that stomach,

was there any explanation that you saw?

                        *    *    *

A.      If that's what he was comfortable doing, then it's

appropriate.

Tr. 916-917.

His answer, aside from being unresponsive, reveals no knowledge of Dr. Gouge's

4

testimony who, when asked by defense counsel why he removed the distal stomach, testified:

> Q.     Why. Why do you remove the distal stomach?
>
> A.     So – there are a number of reasons why I elected in cases like this to remove the distal stomach.
>
> In any Roux-en-Y gastric bypass, that portion of the stomach is taken out of the circulation and never put back into it.  It has no role in contributing essential nutrients, digestive enzymes or anything else to these patients.
>
> On the other hand, it can be the cause of complications, potentially very serious complications both early and late after this operation.
>
> So in the super-obese group of patients, based on our experience, we had chosen to follow suggestions by other surgeons to eliminate that portion of the stomach to simplify the operation.

Tr. 490.

The names of those "other surgeons" or recognized treatises "suggesting" the removal of the distal stomach was not revealed.  His observation that the removal of the distal stomach "can be the cause of complications . . . both early and late after this operation" was prophetic.

The record thus clearly compels the conclusion that the removal of the distal stomach was a departure from the standard of care that should have been observed and

5

was malpractice.

The malpractice that is the basis for this action is not only the botched bariatric surgery, but is also claimed to have persisted over a period of more than two years at various stages of Jupiter's post-operative care, each of which will be separately addressed.

     I.     <u>The Negligent Hospital Discharge</u>

Jupiter was first discharged from the hospital on May 14, 2003. Two days before that his white blood cell count was 17.5, having risen from a count of 13.5 on May 4th. Tr. 185. The normal range for a white blood cell count at the NYVA was testified to be between 7 and 11. Tr. 518. The significance of a white blood cell count was explained by Dr. Edward Telzak, the plaintiff's expert witness whose specialty is infectious diseases, to be "the body's primary method of fighting infection." Tr. 184. He testified that the count of 17.5 was a marked or severely elevated white count, Tr. 185-86, and there being no other apparent cause at the time for that elevated count, should have alerted the doctors to the real possibility of a gastric leak or intra-abdominal abscess which are known complications of gastric bypass surgery. Tr. 187.

In the context of the other factors to which he testified, it was his opinion, with a reasonable degree of medical certainty that the discharge of Jupiter from the NYVA with that severely elevated white blood cell count was a departure from accepted medical practice. Tr. 188. The basis of his opinion was the importance for the treating physicians to evaluate the possibility of any ongoing infection, in particular an ongoing intra-abdominal infection that could have arisen post-operatively. More succinctly, it was the "responsibility of the physician to formulate a differential diagnosis in order to

6

assess what is going on, what is responsible for the infection." Tr. 186. That responsibility was irresponsibly ignored.

Dr. Randall was of the same opinion, namely, that the elevated white blood count was a significant indication that there was an ongoing infection at the time and discharging Jupiter without having even considered a differential diagnosis to exclude an intra-abdominal leak or infection was a departure from accepted medical practice. Tr. 70-71.

Drs. Randall and Telzak were men with extensive experience in their respective areas of expertise as was made manifest by their curricula vitae but more importantly, they impressed the Court as very knowledgeable regarding the specific issues at stake and very credible. Each was refreshingly responsive to questions whether on direct or cross examination, leaving not the slightest suggestion of evasion or dissembling.

II.    Post Operative Care

Jupiter was readmitted to the NYVA on June 13, 2003, and an evaluation of his condition then revealed a urinary tract infection (UTI) which was treated and effectively eradicated. On June 23, 2003, Jupiter's white blood count was 17.3, his UTI was cured and he was discharged from the NYVA and sent to St. Alban's Hospital. That discharge, Dr. Telzak testified, was repeatedly a departure from accepted medical practice for the same reasons that he testified it was such a departure when Jupiter was discharged from the NYVA on May 14, 2003, namely, no determination was attempted to be made as to why his white blood count remained elevated. Tr. 194. His testimony was fortified by the fact that several months later, in November, 2003, an abdominal CT scan evidenced a gastric leak and fluid in the ultra-abdominal cavity which, he testified, was the cause of

7

the elevated white blood count on June 23rd.

It is important to note in this regard, that the defendant's infectious disease expert, Dr. William Mandell, when asked whether on June 23, 2003, there was "any other reasonable suspicious causes of Jupiter's infection during that June admission after the urinary tract infection was resolved other than possible ultra-abdominal leak and abscess, his answer was "Not to my knowledge." Tr. 717. What is remarkable about that response, given this voluminous record and the virtually unanimous acknowledgment of every other medical witness, when asked whether he believed that "there was ever an intra-abdominal abscess present in Warren Jupiter's abdomen?" his answer was "There was no evidence of that." Tr. 660.

That response aside given Jupiter's admission to the St. Alban's facility on June 23rd with an elevated white blood count, Dr. Mandell testified that he would expect Jupiter's temperature to be taken there once or twice a day. The record of Jupiter's stay there, however, reflected no evidence that his temperature was taken at all between June 23rd and June 29th; and during most of July. Tr. 724-26. When asked whether that failure to record his temperature was a departure from accepted medical practice, his response was "I would agree that they should have recorded his temperature." Tr. 726.

Dr. Telzak's opinion that it was negligent to discharge Jupiter on June 23rd and transfer him to St. Alban's without having determined the cause of an elevated blood count referenced above, was soundly based on the facts at the time but was also echoed by Dr. Gouge, the operating surgeon who also believed a differential diagnosis to determine the source of the infection should have been made. In that regard, the Court is constrained to set out a segment of the cross examination of Dr. Gouge who has

8

testified as an expert witness more than a hundred times, Tr. 556, as follows:

Q.  Okay. If Mr. Jupiter had a white blood count of not 1,400 but 17,500, if his urinary tract infection had been cleared up, would you not be suspicious in June of 2003, a few months after his surgery, that there might be the persistence of a leak in an abscess?

A.  No, sir, I would not.

Q.  If I were to tell you, Doctor, that Mr. Jupiter had a continuous elevated white blood cell elevation from the time of the – postoperatively, during that admission, right through this period of time of June of 2003 when he was discharged to St. Albans Hospital, would that be of concern to you as a surgeon?

A.  In terms of surgical issues, that would be a major index of, no, sir, that would not be of particular concern to me.

Q.  Well, during that June admission, were you not consulted and indicated that other sources of infection should be considered for Mr. Jupiter other than the urinary tract infection?

A.  Yes, sir.

Q.  And did you do anything to evaluate that at that time?

A.  Other than examining him, no, sir.

9

I made recommendations to the medical service where he was a patient.

Q.    Okay.

Was he on your service anymore?

A.    We were following him as consultants.  He was not on my service at that time to the best of my recollection.

Q.    So who then, Doctor, is charged with following up at that point to determine what those other sources of infection might be?

A.    The physicians caring for Mr. Jupiter on the medical service, sir.

Tr. 557-558.

Q.    So, is it your testimony that it was not your job or your department or your service to follow up on the other sources of infection that might be responsible for the white blood count, but it was the medical service's responsibility to do that?

A.    It was their direct responsibility to follow up on that. It was our responsibility to follow up Mr. Jupiter on any surgical issues.

Tr. 559.

His indifference to the precarious condition of Jupiter, upon whom he, as the surgeon in charge performed a major operation just two months previously, who was

10

evidencing glaring indications of infection, indifferent to whether his recommendation was heeded, as to whether anything at all was being done to address the possibility of an internal gastric leak attributable to his surgery because it was the medical service's responsibility and not his, is an indifference bordering on callous. His testimony is startling given the testimony of Dr. Elizabeth Weinshel, the Deputy Chief of Staff of the NYVA who, when asked whether the department of surgery was responsible for the patient's follow up care, answered "sure." Tr. at 273.

Jupiter was transferred from St. Alban's to the NYVA on October 15, 2003, with an intervening gap from August 5 to 11 when he was at the NYVA for treatment of a urinary infection and returned to St. Albans. During that entire intervening period from June through October, Jupiter was unable to tolerate food. The record is replete with reports of his loss of appetite, inability to eat, let alone enjoy, food that he formerly enjoyed and would specially request. Tr. 378-79; 413. Dr. Charles Mueller, an expert on clinical nutrition attributed his loss of appetite and very poor intake to an infectious process that became apparent early after his surgery. Tr. 446. Dr. Mueller's opinion was a succinct statement of a more explanatory one given by Dr. Telzak who, as has already been said, impressed the Court by the clarity of his testimony and his credibility. During the four month period between June and October, the medical record reveals Jupiter's progressive debilitation, anemia and what would be generally described as a failure to thrive. Dr. Telzak ascribed that steady deterioration to "an untreated intra-abdominal abscess and a chronic infectious process." Among the many indications that might alert a doctor to an intra-abdominal infection is "anorexia or a complete distaste for food." Tr. 197, 201. Dr. Randall, who like Dr. Telzak, impressed the Court as an expert witness who

11

understood his function to be to assist the Court in understanding the exquisite complexity of the functioning of the human body[1] and discharged that function responsibly. The causal relationship between a failure to thrive and an infection is best described in his own words as recorded at trial. After a reading of a portion of an entry in the voluminous medical record recommending a consultation regarding the possibility of an abscess around the surgical site that explains Jupiter's poor appetite, Dr. Randall was asked:

> Q.    Where in this note it says an abscess that explains patient's poor appetite, what is the relationship between an abscess and poor appetite?
>
> A.    There are several. One, the body is sick, there is an infectious process inside so the ability to eat could be turned off. You could have desire but then the body doesn't really want to eat. It's almost like if you get a pneumonia, you have the desire to eat but you start to eat, oh, I don't feel like eating.
>
> The added component here that is important to understand is any time there is leak or an abscess, it creates a surrounding inflammation. An inflammation can create scarring. Once you create scarring and especially in an area that is leaking, there is going to be narrowing and very difficult things to pass through the connection from the stomach to the small

---

[1] A witness may testify as an expert if his "scientific, technical or other specialized knowledge will <u>help the trier of fact to understand the evidence</u> . . . ." (emphasis added). Fed. R. Ev. 702.

intestine.  And that creates the ability that even though you
try, you can't.

Tr. 49-50.

Dr. Randall was then read a note from the medical record made by Dr. Neil
Steigbigel, an infectious disease expert, which makes reference to an "entire clinical
picture of anorexia" and he was asked to explain the meaning of "clinical picture of
anorexia."  His response was as follows:

A.     The clinical picture of anorexia, my interpretation in this instance is
       there is no desire to eat anymore.  It's not like he can't – because he
       has tried so many times, he can't.  So it's an adverse reaction of the
       inability to eat.

       And plus the infection process, as I mentioned earlier,
       many infectious processes take the ability to eat away.  They
       could eat something, then enough, I can't eat anymore.  It
       doesn't mean they are not able to, it just means they can't.

Q.     Again, where it says here the CT – that the entire clinical picture of
       anorexia, profound weight loss, high seg(sic) rate, anemia of chronic
       disease is all consistent with the gastric leak and closed space intra-
       peritoneal infection (abscess).

       So when Dr. Steigbigel notes that, he refers to a closed
       space intra peritoneal infection for an abscess, what does that
       mean?

A.     When you get an infectious disease consult, they are

13

really experts in identifying and how to treat infections. And

he is identifying the problem that has been here and he is

making a synopsis in a few words to say this is really what has

been going on all this time period.

He has been – the prolonged anorexia, the high

sedimentation right(sic), which is a sign of inflammation, and

the anorexia.

Tr. 51-52.

Dr. Weinshel, to whom reference was made above, was called as a witness by the

plaintiff. Although properly characterized in law as a hostile witness, she did not impress

the Court as hostile. On the contrary, she impressed the Court as conscientiously

answering questions candidly and responsively and credibly. She agreed with Dr.

Steigbigel's note in which he referred not only to anorexia being reflected in the entire

clinical picture, but also to "profound weight loss, high sed rate, anemia of chronic

disease, . . . all consistent with the gastric leak and the closed space peritoneal infection

(abscess)." Tr. 283.

The significance of the failure to make or even attempt to make a differential

diagnosis which the undiagnosed elevated white blood count, the fever (the inexplicable

failure to take his temperature for weeks), his progressive debilitation, failure to thrive,

anorexia, virtually cried out for is, that if that were done and the relationship between an

intra-abdominal leak and the infection was revealed and corrective surgery performed at

or about June 2003, the likelihood of a successful outcome was better than it was when

that surgery was finally performed approximately 5 months later, in November. Tr. 76,

14

195-96.

III.   The CT Scan That Wasn't Done

A note in the medical record dated June 13, 2003 at p. 348, reflects the desirability of having a CT scan.  It reads: "Unable to CT abd. pt is over CT table's wt limit.  Team to follow abd exam and consider CT scan of ABD? at Bronx Zoo (large animal capacity)."

Dr. Weinshel agreed that a CT scan was the most desirable way for diagnosing an intra-abdominal abscess and one was wanted to have done.  It wasn't done, however, for the reason that it was presumed by most people that:

> A.    . . . The guy was too heavy for the carriage of the CAT scan.  they wouldn't do him, couldn't be imaged any other way and we were looking for evidence of infection.  CAT scan was the best test.

> \* \* \*

> Q.    So you agree now, doctor, that the CAT scan was the best test to look for evidence of infection?

> A.    Yes.

> \* \* \*

> Q.    And when you say "They wouldn't do him," who wouldn't do him?

> A.    The radiology department had only one device, the one machine and they had a well known limit for weight of the carriage.

> Q.    Who wouldn't do him?

15

A.   The technicians, the chief of the service, . . . .

Tr. 291-93.

No attempt was ever made prior to November 24th, 2003 to do a CT scan of Jupiter's abdomen. Tr. 294-95. The failure to even try to do a CT scan on Jupiter was attributed to an institutionally imposed table weight limit of 350 pounds. NYVA at 997. No evidence was elicited as to why or how that weight limitation was arrived at given that the weight limitation specified by the manufacturer was 450 pounds. Tr. 63.

Called to testify for the plaintiff was Alfio Banegas, a radiologic technologist licensed by the New York Health Department with extensive experience as a registered CT scan technician among other imaging modalities. He has served in that capacity for 18 years in the Hospital for Special Surgery, Memorial Sloan-Kettering and New York Presbyterian Hospital and Lenox Hill Hospital. Tr. 346-48. He was familiar with the Siemens Somatom CT machine that was used at the NYVA, a picture of which was received in evidence. Tr. 353. His undisputed and unequivocal testimony, illustrated with references to photos of the CT scan machine explained how that machine could have accommodated Jupiter's abdomen and obtained the required images of it. It is surely not inappropriate to recall in this regard the testimony of Dr. Randall to the same effect. Tr. 64-66. In light of the above, the testimony of Dr. Weinshel is virtually dispositive:

Q.   Do you agree, doctor, that if Mr. Jupiter could have fit
        in that CT scan by weight and otherwise on November
        5th, it should have been done at that time?

A.   Yes.

*   *   *

16

Q.    Doctor, would it have been a departure from accepted
      medical practice not to have done it at that time if he
      could fit in the machine?

A.    If we were aware that he could fit in the machine then,
      yes, it would be.

Tr. 295.

The NYVA was not "aware" that Jupiter could fit in the machine because no attempt was ever made to do it which is inexplicable and inexcusable given the undisputed testimony of Alfio Banegas that a CT scan image of his abdomen was clearly possible. The failure to obtain one long before November 24th, 2003 when it could have been was, the Court concludes, a failure to observe the standard of care the circumstances demanded.

A CT scan was eventually obtained on November 24, 2003 and revealed a gastric leak and a closed space peritoneal infection, an abscess which provides an explanation for "the entire clinical picture of anorexia, profound weight loss, high sed rate and anemia." Tr. 23. The steady deterioration of Jupiter that began after his bariatric surgery was the result of an untreated intra-abdominal abscess and a chronic infectious process that was causing his body to become progressively debilitated." Tr. 197. Spread throughout this voluminous record is the medical understanding that there is a relationship between the lack of tolerance for food, the refusal to eat, anorexia and an ultra-abdominal infection. See, for example, Tr. 283 (Dr. Steigbigel); Tr. 197 (Dr. Telzak); and Tr. 582 (Dr. Gouge). The recognition of that relationship and the awareness of Jupiter's progressive debilitation, significant weight loss (more than 200 pounds in the post op period),

17

rejection of food, anorexia and anemia notwithstanding, it wasn't until the long delayed CT scan on November 24, 2003 that a gastric leak, an abdominal abscess traceable to the bariatric surgery was definitively identified.

The significance of that identification is made manifest by a note at page 979 in the medical record, Ex. 1A, by Dr. Neal Steigbigel, an esteemed clinician, Tr. 205, who, after examining the CT scan opined that Jupiter "will need surgical drainage and gastric repair - a formidable procedure in this currently debilitated patient." In that regard it is noteworthy that Jupiter's weight on November 24th was essentially the same as it was on October 15th when he was admitted to the hospital, Tr. 209, and a CT scan would not have been precluded by his weight at that time even given the inexplicable weight limitation imposed by the hospital. Indeed, Dr. Raicht, who was the division chief for the Department of Medicine at NYU which encompasses the VA, Tr. 309, agreed on October 22, 2003 that a CT scan of the abdomen should be ordered to "rule out occult smouldering intra-abdominal infection (CT scan if possible given patient's size)," Ex. 1A at 687. Dr. Telzak testified that Jupiter would have been more amenable to successful surgery in October being less debilitated then than he was thought to be six weeks later in November. Tr. 210. Dr. Randall testified that the November 24th CT scan and Dr. Steigbigel's evaluation of it that surgical intervention was mandated. The record reflects the following colloquy on his direct examination:

> Q.   Do you have an opinion, Doctor, to a reasonable degree
>      of medical certainty, as to if the surgery were
>      performed on Mr. Jupiter at that time on November 24
>      or November 25, whether that surgery could have been

18

successful and avoided his subsequent impairment and
death?

A.     I could state that going back for complications is very
difficult, no question, but the principles are you need
to drain an abscessed cavity and you need to control a
leak.

If he goes in and operates, which I think should have
been done with a reasonable degree of medical
certainty, they don't have to repair the leak but they
need to drain the abscess . . . .

\*     \*     \*

But absolutely intervention needs to be accomplished.

It was also Dr. Randall's opinion that surgical intervention was indicated well
before November 24th.

Tr. 54-55.

Surgery, however, was not undertaken, the CT scan notwithstanding, but was
delayed until February 13, 2004. That operation was undertaken, Dr. Gouge testified, to
provide a reliable way of continuing to feed Jupiter and to "see if there was anything that
we needed to, or we wanted to take a look and see if there was anything we needed to do
to drain an abscess; correct a defect in the intestinal tract or anything else." Tr. 544.

Dr. Gouge's testimony on direct examination as to what was seen when Jupiter's
abdomen was opened up is significant to relate:

Q.     Could you see his spleen when you opened him up that

19

day?

A.      Yes, sir.

\*   \*   \*

. . .The abdomen was open, the abdomen was retracted . . . which allows us to hold it up and see inside . . . .We could very easily see all the way up and around the diaphragm, see the entire front and side of the spleen . . . .

\*   \*   \*

Q.      When you and your subordinate physicians looked into his abdomen . . . and saw his spleen, was there an abscess that can be visualized?

A.      There was no abscess that could be either seen or felt.

\*   \*   \*

Q.      You can see the spleen, the front of the spleen, right?

A.      You can see the bottom, medial side, top, and outside of the spleen.

Q.      You can't see behind it, can you?

A.      You can't see all the way behind it, no sir.

Q.      Now, did you also feel around the back, where you couldn't see?

A.      Well, the spleen is ordinarily fixed posteriorily, that is, there is no open space there.  We did not try to open that space up.  We looked at all the free space around it

20

and we felt down in the back and there was nothing by

palpitation, that is, by feeling.  Tr. 546-49.

The operative report, which Dr. Gouge didn't write but reviewed and signed off on, stated that "Examination of the abdominal cavity revealed very minimal adhesions."  Tr. 545 and Dr. Gouge agreed that there was no abscess or telltale footprints from an abscess present on February 13, 2004.  Tr. 549.

I characterized the testimony of Dr. Gouge in this regard as "significant" but perhaps "questionable" would have been more appropriate.  Dr. Randall to whom reference has been previously made, was shown the surgical report of that operation, Tr. 30, and testified as follows when asked about it:

> Q.    Is there any mention whatsoever of the spleen?
>
> A.    The word spleen is not in the dictation.
>
> Q.    Mr. Cleary in his opening statement . . . said they
>
> looked at the spleen on that February 13, that is what is
>
> in the chart.  Is there anything in the chart there that
>
> there was any looking or feeling of the spleen?
>
> A.    It does not mention spleen at all.
>
> *    *    *
>
> Q.    And if you did explain (sic) [examine] the spleen and
>
> you did look for an abscess and you did examine it, is
>
> there a certain standard of medical practice that
>
> requires there be some documentation of that being
>
> done?

21

> A.     That would be the standard of care especially if you are
> going back for an operation, you want to describe the
> important elements -- if the spleen was palpated, I felt
> the spleen, I do not feel any abscess, I looked at the
> anastomosis if that was the plan.  I did not see any
> leak, not to say everything looked okay up there.  That
> doesn't help because you don't know if they were really
> there.  That doesn't quantitate or identify if that's what
> they were really looking at.

Tr. 34-35.

The testimony of Dr. Nick Gabriel, the government's expert witness, on this aspect of the February 13th operation is revealing.  On cross-examination he was asked:

> Q.     If you visualize the spleen, you would expect to report
> that in the operative report so that you would have the
> advantage of knowing what it shows, isn't that true,
> sir?
>
> A.     That would be fair, correct.
>
> Q.     Doctor, do you agree that it would be a departure from
> accepted medical practices for a doctor to have
> conducted this operation, examine the spleen and not
> put any finding whatsoever in the report about the
> spleen?
>
> A.     It's unfortunate that that fact may have been omitted

22

from this operative report but I'm looking at the rest and according to this operative report, they did explore the peritoneal cavity. They did an examination of the abdominal cavity which revealed minimal adhesions and there was very little evidence of a previous intra-abdominal catastrophe.

THE COURT:     I don't think you responded to the question, doctor.

Q.     There is no description of the spleen having been examined, isn't that true, sir?

A.     I don't see it here but I can tell you that it's . . . .

Q.     Does good medical practice dictate if it was examined, it should be in the report?

A.     It should be, yes.

Q.     And do you agree, sir, that it would be a departure from good and accepted practice to have examined the spleen and not reflected that in the report?

A.     It was just an omitted fact, so I can't tell you if it was a deviation from the standard of care.

Q.     Kind of important, wouldn't you say, that if the spleen were examined in a case like this or the area around the spleen were examined, wouldn't you say that that would be kind of an important thing to put in the

23

> report if that were done?
>
> A.     I believe so.

Tr. 935-36.

Those opinions notwithstanding, the government 's main witness, the operating surgeon, Dr. Gouge, when asked:

> Q.     Didn't you think it would be important to have in this
> report that an examination was made of the spleen.  An
> examination was made to look at the abscess to feel
> behind it and around it as you describe?
>
> A.     No, sir.

Tr. 575.

The acute awareness of Dr. Gabriel, the government's expert, that he was a witness for the defense, his stunning evasiveness so exquisitely portrayed, is magnified by just five lines of the transcript of his direct examination:

> Q.     Doctor, at any time was an abscess ever diagnosed in
> this patient in the 6,000 pages of medical records that
> are sitting over there that you've reviewed?
>
> A.     I think the only abscess that was diagnosed was in his
> brain.

Tr. 887.

A similar remarkable response was elicited from another expert witness called by the government, Dr. William Mandell, who, on direct examination, testified as follows:

> Q.     Doctor, do you believe there was ever an intra-

24

abdominal abscess present in Warren Jupiter's

abdomen?

A.    There was no evidence of that.

Tr. 660.

Those responses, given a record that reeks with the foul odor I would imagine an infectious abscess emits and that almost makes one feel the ooze of an anastomic leak are disturbing.

Secure in the belief that the findings I have made thus far compel the conclusion that the defendant's medical malpractice which had its genesis in the mindless removal of Jupiter's distal stomach and progressed relentlessly and causally to his death, I will not burden those findings any further beyond a few oblique references to glimpses of testimony from other government witnesses which fortify those findings.

For example, the finding that the removal of the distal stomach precluded providing needed nutrition to Jupiter directly through the gastrointestinal system and necessitated subjecting him to the danger of providing that nutrition intravenously through PICC lines was confirmed by Dr. Hillel Bryk. Dr. Bryk, an interventional radiologist called by the government, who had no recollection of any interaction with Jupiter, confirmed that providing Jupiter with needed nutrition intravenously by PICC lines necessitated by the removal of the distal stomach, was done at the risk of causing acute infection. Tr. at 266. Dr. David Seres, an expert in internal medicine and nutrition, agreed that intravenous artificial nourishment by the use of PICC lines is inherently risky and considered a last resort because the risk of a systemic infection is substantial. Tr. at 818. Those PIIC lines did cause an infection in Jupiter's brain which

25

was also a contributing cause of his death.

The government also called Dr. Fred Smith, a clinical pathologist from whom testimony was elicited based on his examination of an autopsy report prepared by the Chief Medical Examiner of the City of New York.  The testimony of Dr. Smith spanned pages 827-868.  The determination of the reliability of his testimony regarding one significant fact, the existence of which is established beyond doubt in this voluminous record, is reflected in a few excerpts from the transcript.  On direct examination, he was asked:

> Q.   Dr. Smith, do you have an opinion within a reasonable degree of medical certainty as to whether the autopsy performed on Warren Jupiter revealed the existence of an anastomotic leak at the time of death?
>
> A.   Yes, I do.
>
> Q.   What is your view, Doctor?
>
> A.   My opinion is that it did not reveal such a leak.
>
> Q.   Do you have an opinion within a reasonable degree of medical certainty as to whether the autopsy performed on Warren Jupiter revealed the existence of an intra-abdominal abscess at the time of death?
>
> A.   Yes, I do.
>
> Q.   Doctor, what is your opinion?
>
> A.   My opinion is that it did not.

Tr. 831.

On Cross-examination, after acknowledging that he has never participated in or witnessed bariatric surgery and has no familiarity with the variants to a bariatric Roux-En-Y gastric bypass procedure, Tr. 848-49, and after further questioning he also acknowledged that he did not consider the autopsy report a careful analysis of the intra-abdominal status of Jupiter's body. Tr. at 858.

More telling, however, in light of his testimony on direct examination set out above, was this exchange on re-cross examination:

> Q. . . . based upon the autopsy report then, Doctor, is it your opinion . . . that there never was an anastomotic leak?
>
> A. No, that's not my opinion.
>
> Q. Was there any evidence in the autopsy report that there ever was an anastomotic leak?
>
> A. There's no evidence one way or the other.
>
>             *   *   *
>
> Q. Do you have any knowledge as to how much of a leak there was?
>
> A. No, I don't.

Tr. 867-68.

A continuous line by line re-reading of this transcript of more than 1,000 pages was riven by the stark contrast each reading more sharply brought into focus between the testimony of the expert witnesses for each side. Those who testified for the plaintiff I found to be responsive, credible and fulfilling the role an expert witness is called upon to

27

play, namely, assisting the Court in understanding what bariatric surgery entails in all its anatomic complexity, and the collateral consequences foreseen and unforeseen of its post-operative care. Those who testified for the government, with one notable exception, Dr. Weinshel, brought to mind observations I made more than 25 years ago in Rubenstein v. Marsh, 1987 WL 30608 (E.D.N.Y.) at *7: "To the extent that these witnesses undertook to testify, they did so not as detached scholars . . . motivated by the sole purpose of assisting the fact-finder with an objective evaluation of the relevant data but as partisans. When expert witnesses become partisans, objectivity is sacrificed to the need to win. Testimony which is prompted by that need and that goal may deprive an injured plaintiff of the compensation that may be justly due him or wreak havoc upon the reputation and financial condition of the defendant."

I turn now to the difficult question of just compensation to be awarded for the pain and suffering endured by Mr. Jupiter and for the loss suffered by his three children by the death of their father caused by the medical malpractice for which the Court finds the defendant is liable.

Pain and Suffering

Efforts to devise a satisfactory solution to the challenges of putting a price on pain and suffering for tortious injuries have eluded all who have risen to meet it. Scholars who have enlisted in the challenge are, among others, Randall R. Bovbjerg, et al., Valuing Life and Limb in Tort: Scheduling "Pain and Suffering." 83 Nw. U. L.R. 908 (1989); Ronen Avraham, Putting a Price on Pain and Suffering Damages: A Critique of the Current Approaches and a Preliminary Proposal for Change, 100 Nw. U. L.R. 87 (2006); Robin L. Rabin, Pain and Suffering and Beyond: Some Thoughts on Recovery for

28

Intangible Loss, 55 DePaul L.R. 359 (2006); Mark Geistfeld, Placing a Price on Pain and
Suffering: A Method for Helping Juries Determine Tort Damages for Nonmonetary
Injuries, 83 Calif. L.R. 773 (1995); Guido Calabresi, The Costs of Accidents: A Legal and
Economic Analysis (1970). The usual formulation of the problem is a frank recognition
that a monetary award does not achieve the Court's objective of making the injured
plaintiff whole. Certainly, in a wrongful death case that is an oxymoron. The objective
there is to compensate the estate of the deceased for the pain and suffering he endured
during the relevant time that he lived. That compensation is accomplished symbolically
in the recognition that pricing pain and suffering is inescapably subjective. The
inevitable consequences of subjectivity is disparity - persons enduring what are divined
to be a similar degree of pain and suffering, receive different awards. Although the
validity of the implied assertion that disparity is unacceptable is debatable, disparity is
presumed to be unacceptable per se. The law aims to be fair, evenhanded and
predictable. Persons who suffer and experience pain to the same degree should expect to
be similarly compensated. Conversely, similarly situated defendants should be burdened
by similar judgments. The question one is then led to ask is how are degrees of pain to be
measured and compared? Yielding as one must to the unanswerability of that question,
courts resort to other cases for guidance. See, i.e., Nairn v. National Railroad Passenger
Corp., 837 F.2d 565, 568 (2d Cir. 1988); Consorti v. Armstrong World Industries, Inc., 72
F.3d 1003, 1009 (2d Cir. 1995).

It is worth noting at the outset that "pain" and "suffering," are words not readily
defined with precision beyond "we know it when we feel it," that embrace other similarly
amorphous human experiences such as "loss of enjoyment of life," "emotional distress,"

which the cases also uniformly describe as difficult to quantify, or not susceptible to price with mathematical certainty. They eschew definition by intoning that the measure of damages in that event is determined by the trier of fact to be fair and reasonable compensation based upon all the evidence in the case. And when claims are made of excessiveness or inadequacy of the award then guidance is sought from the awards made in cases involving related tortious conduct and similar injuries or both. Cases of medical malpractice abound, but few or even one, however, is not easily found of botched bariatric surgery on an obese man whose negligent post-operative care aggravated almost daily the consequence of that ill-fated operation. The award must therefore be made based in the light of all the evidence in the case and on as objective and dispassionate an assessment of that evidence as can be made by this trier of the fact of an award that is fair and reasonable compensation for the harm proximately caused by that malpractice.

This opinion began with the observation that Jupiter elected bariatric surgery to address his obesity. It is reasonable to assume that he subjected himself to that major operation with the expectation that it will be successful, that his obesity will have been bested and that the remaining years of his life will be enjoyed without the disabling limitations obesity imposed on the pleasurable activities of life. The realization of that expectant hope was to be denied him. Little did he know that "a hospital is a dangerous place," as Dr. Weinshel put it albeit appropriately in an entirely different context. Tr. at 312. For the next two and a half years, until December 6, 2005, he was revolved in and out of VA facilities as has been related above.

Jupiter's physical and mental deterioration as he was shuttled to and from one VA facility to another is meticulously documented in the 6,000 page medical record in

30

evidence. The significant essence of that record compelled the conclusion of malpractice attested to with certainty by expert witnesses. What that record and that testimony portrays is a portrait of an obese man who hoped to restore his image to one of relative normalcy by bariatric surgery. That hope was sadly dashed by a misguided operation and virtually all of the two and a half years spent as a hospital patient that followed. Two and a half years of progressive debilitation caused by an inexplicably belated diagnosis of gastric leakage, clearly and repeatedly signaled by an inability to tolerate food, inability to eat the food he loved, anorexia, profound weight loss and understandable depression. He was bedridden virtually throughout. He was incontinent and had a catheter inserted in his penis with the urine collected in a bag at bedside which would not be timely emptied, overflowed and left a urine soaked floor. Tr. 383, 415. He had what his wife undisputedly described as "stage IV bedsores" which were more "horrific" than anything she had seen in her life. They were ugly and black, covered his buttocks and legs, the size of a football field. Tr. 414. He gradually lost the use of his arms and legs, lost the ability to feed himself and eventually lost the ability to do such simple things as lift a telephone or a TV remote control.

The infection of his brain directly attributable to the PICC lines, the use of which were necessitated by the removal of Jupiter's distal stomach caused puss to accumulate there and required holes to be drilled through his skull to remove it.

The Court's attempt to convey in prose a feeling for the pain, the indignity that accompanies incontinence, the inability to feed oneself, to be bedridden, to be the involuntary subject of invasive medical procedures; to capture the emotional turmoil that comes with the sudden awareness of never being able to walk again and worse, that death

31

awaits, would be an attempt that the poverty of language or my poor command of it precludes, and is confidently left to the imagination of the reader. A surer sense of all that would perhaps be better conveyed from a reading of the faithful visits with her father as described by his daughter Sara, in pages 375-395 of the trial transcript and by his wife Barbara, who although separated from Jupiter, visited him and ministered to him almost daily throughout his hospitalization. See pages 403-417.

Resorting to other cases for guidance as the Court is advised to do in "pricing" pain and suffering, suggests that the relevant cases would be only those in which the period of the offending endurance was approximately the same. To equate the degree of pain suffered by a decedent with the pain of others discussed in the cases or to pretend to do so would be sophistry. A string citation of cases read in which the duration of the pain and suffering spanned a period of months to approximately three or slightly more years, revealed awards that ranged from roughly one to five million dollars.

Consorti v. Armstrong, *supra*, was a case the Court found instructive. The opinion in that case written by Judge Leval, in which Judges Newman and Altimari concurred, was a comprehensive, reasoned discussion of the problem in all of its ramifications. The period in that case over which the pain and suffering was endured was roughly equivalent to the period at issue here. The cause of death was pleural mesothelioma, an incurable cancer of the lining of the lung. Mr. Conforti died at the age of 51. Mr. Jupiter died at the age of 54. Although recognizing that to equate with this case the degree of pain and suffering gleaned from the cause of death in that or any other case is hopelessly flawed, my assessment of the degree of pain and suffering endured by Jupiter over a period of approximately 950 days is that it was gnawing and persistent. "We take it as a given,"

32

wrote Judge Leval, "that reasonable people of his age, in good mental and physical health would not have traded one-quarter of his suffering for a hundred million dollars." 72 F.3d at 1009. I too, would take it as a given that even a person in Jupiter's mental and physical health would not have made that trade.

Based upon all of the circumstances and the context in which the facts were found, an award of 5 million dollars in hereby made to Barbara Jupiter, as Executrix of the Estate of Warren Jupiter, for his pain and suffering endured from June 23, 2003 to December 6, 2005, the day he died slowly and painfully.

Jupiter was survived by three children who were 16, 19 and 21 on the day he died. A defendant found liable for the death of a parent is liable, not only for the pain and suffering endured by him prior to his death, but liable also to his surviving children who, by virtue of his death, were deprived of the assistance, guidance and support from that parent that they would have enjoyed had he lived. In that regard, the number of years the deceased would be expected to have lived, that is, his life expectancy is generally relevant. An opinion was rendered by Dr. Milano that Jupiter's life expectancy was 12.72 years, an opinion based on his evaluation of Jupiter's risk profile prior to his bariatric surgery. The plaintiff asserts that opinion to be inaccurate in that it failed to account for Jupiter's longer life expectancy had he survived successful bariatric surgery. In an extensive footnote numbered 49 on pages 56-57 of the Plaintiff's Proposed Findings of Fact and Conclusions of Law, the plaintiff acknowledges that accepting Dr. Milano's evaluation it is "fair to conclude that such reduced life expectancy would have negligible, if any, effect on the loss of parental guidance damages."

It is plainly true that the impossibility of "pricing" pain and suffering is also true of

putting a dollar value on the loss to a child of parental guidance. A resort to the cases provides a fragile read to lean on for guidance. The value that is placed on that loss is, in the final analysis, dependant upon factors such as the ages of the children and the nature, quality and depth of a relationship they had with that parent. That value is determined by a "sense," a "feel" the fact finder has from a consideration of those factors in the light of his own life's experience and judgment. I have listened carefully to the account each of Jupiter's children gave of their relationship with his or her father. I have listened carefully to their respective testimonial accounts addressed as they were to the mind through the ear of the hearer. I read and re-read their words in print that reach the mind though the eyes of the reader. A critical, unhurried reading frequently lends the words a nuance, an insight which eludes those words fleetingly spoken. A studied consideration of those factors precludes a finding that the loss of any one of the children was greater or less than the loss suffered by the other from the death of their father. The extent and nature of the relationship had by each child with him can only be valued symbolically in a sum of dollars a fair and reasonable amount of which I find to be $900,000, to be divided equally among the three.

Conclusion

In sum, the findings of fact and conclusions of law discussed at some length above drive me to conclude hat the medical malpractice of the defendant which, in some respects can be aptly characterized as egregious, proximately caused the pain and suffering endured by Warren Jupiter from June 23, 2003 to December 6, 2005, and for which compensation in the sum of 5 million dollars is awarded to Barbara Jupiter, as Executrix of his estate. For the loss of the assistance, guidance and nurture they suffer by

34

the death of their father proximately caused by the medical malpractice of the defendant, Sara, Hannah and Joshua Warren are awarded the sum of $900,000 to be divided equally among them.

       SO ORDERED.

Dated:       Brooklyn, New York
              December 20, 2012

                                        s/ILG
                               I. Leo Glasser

35