UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------x
BARBARA JUPITER, as Executrix of
the Estate of Warren Jupiter, and
BARBARA JUPITER, Individually,

                     Plaintiff,                    MEMORANDUM AND ORDER
                                                        05 CV 4449 (ILG)

   -against-

UNITED STATES OF AMERICA,

                     Defendant.
------------------------------------------------x
GLASSER, United States District Judge:

       The Defendant has moved pursuant to Fed. R. Civ. P. 52(b), 59(a)(2) and 59(e), for a new trial, amended or additional findings, or an order amending the December 20, 2012 judgment issued by the Court. "A motion for a new trial in a non-jury case or a petition for rehearing should be based upon manifest error of law or mistake of fact, and a judgment should not be set aside except for substantial reasons." 11 Wright, Muller, Kane, Federal Practice and Procedure § 2804 (3rd ed. 2012), cited in Ball v. Interoceanica Corp., 71 F.3d 73, 76 (2d Cir. 1995).

       At the conclusion of a seven day bench trial, the Court found the defendant liable for the wrongful death of Warren Jupiter. Findings of fact and conclusions of law were made in a 34 page Memorandum and Order ("M&O"), Dkt. No. 82. In its motion, the defendant challenges those findings and conclusions for reasons advanced in a 31 page memorandum of law in which it contends that: (1) the Court did not consider evidence that Jupiter did not have a gastric leak and abscess; (2) the Court did not consider Jupiter's psychological condition; (3) the Court did not consider the absence of post-surgery abdominal pain and normal readings of temperature and white blood cells; (4)

1

the Court misinterpreted the testimony of Dr. Gouge; (5) the Court erroneously found the removal of Jupiter's distal stomach to be the proximate cause of his damages, and (6) the Court's award of damages was excessive as regards both Jupiter's pain and suffering and the loss to his children of the care and guidance of which they were deprived upon his death.

Spirited argument in support of and opposed to that motion which, but for the absence of witnesses and exhibits was, in essence, a mini re-trial.

I am acutely conscious of the challenges presented by these motions to a judge who has conducted a bench trial. He is asked to agree that he made manifest errors of law, mistakes of fact and rendered a judgment which was flawed. To meet those challenges, he must try to disembody himself, and in another incarnation imbued with humility, examine the merits of their claims. I have made that effort, reviewing the transcript of the trial and when needed, the relevant record in the laser-like light the defendant has aimed at them. That re-examination leaves me at ease in the firm belief that I did not err in my findings of fact and conclusions of law as regards the liability of the defendant for the wrongful death of Mr. Jupiter. As to the defendant's claim that my award of damages for his pain and suffering is excessive, that must be left for another forum to decide. A determination by me that the award is not so excessive or outrageous with reference to all the circumstances of the case as to demonstrate that I have not "suffered passions, prejudices, or perverse disregard of justice to mislead me," would understandably be viewed with skepticism. Whipple v. Cumberland Mfg. Co., 2 Story 661, 670, 29 F. Cas. 934, 937-938 (C.C.Me. 1843).

2

The defendant's claim that the award of damages to the children was excessive has merit and that motion for additional findings and an amended judgment is granted as will be discussed hereafter.

    I.     I failed to consider evidence that Jupiter did not have a gastric leak and abscess.

I am at a loss as to how to respond to that assertion. A gastric leak with the abscess attendant upon it flowed through each of the seven days of this trial. At page 25 of my M&O I described the record as one that "reeks with the foul odor I would imagine an infectious abscess emits and that almost makes one feel the ooze of an anastomic leak." Without encumbering this response with numerous references to the record, I will note only two, both acknowledgments by the defendant's witnesses of the existence of a leak. One is Dr. Weinshel's agreement with Dr. Steigbigel's reading of the long overdue CT scan as reflecting a "proximal gastric leak," pages 13-14 of the M&O, and the other is Dr. Gouge's testimony regarding leakage from the gastrointestinal tract shown on a CT scan of November 24, 2003. Tr. 535-536.

    II.    I did not consider Jupiter's psychological condition.

There are, to be sure, references in the medical record to Jupiter's depression and intermittent interaction with staff psychiatrists. Dr. Gouge pointedly testified that "Post-operatively, it's characteristic of these patients to have significant amounts of degrees of depression and difficulty in adapting to their new environment, that is their new ability to take food." Tr. 507. The unexpressed thrust of this assertion is that the defendant was blameless for Jupiter's disintegration and that the psychological reason for it is that he was starving himself to death. That view is, I believe, bottomed upon the proposed testimony of Dr. Abraham Halpern, a psychiatrist the defendant intended to

3

call as an expert witness. I granted the plaintiff's motion in limine to preclude his testimony. I concluded, after an assessment of his report, that his opinion would not "in the slightest degree assist me as the trier of the facts to understand the evidence or determine a fact in issue." Dkt. No. 68, familiarity with which is assumed. The unequalled view of the entire case, that only presiding over the trial of it can provide, confirms my determination of that motion. The evidence was compelling that his failure to thrive, inability to eat, distaste for food, loss of appetite, anorexia as being directly attributable to an "untreated intra-abdominal abscess and a chronic infectious process" and not to his desire to commit suicide. The defendant was more than passingly familiar with Jupiter's mental history. In a seven page report dated November 3, 1998, Dr. Brett Gorkin, Jupiter's therapist, responded to Dr. Richard Ores, Special Assistant Chief, A.C.O.S. Department of Veterans Affairs at the VA Medical Center with "information on which to evaluate . . . Warren Jupiter's need for continued fee based treatment," A-5786. Similar reports, were sent to Dr. Ores on October 20, 1997, A-5800; October 12, 1996, A-5812; October 10, 1995, A-5822; October 12, 1994, A-5830; January 19, 1993, A- 5844; and one to Dr. Juliano, Chief of the Medical Administration Services, dated January 2, 1994, A- 5838.[1] And yet, with all that familiarity he was psychiatrically cleared for bariatric surgery. That clearance was necessary, Dr. Weinshel testified, because there are many patients who have eating disorders and eating behaviors that make them challenging. Tr. 265-266. The reason for that clearance was also described as necessary by Dr. Gouge because "you have to be assured that the patient has the mental wherewithal to be able to collaborate and cooperate in the venture." Tr. 479-480.

---

[1] These exhibit references are not mentioned in my findings of fact and conclusions of law as explained hereafter.

4

    III.    I did not consider absence of post-surgery abdominal pain and normal readings of temperature and white blood cells.

In a trial record of more than 1,000 pages, the defendant read two entries from a 6,000 page medical record referencing an absence of abdominal pain, Tr. 120, 123, and quotes two snippets of testimony from Dr. Gabriel, its witness, in which he doesn't recall that Jupiter didn't have abdominal pain and doesn't know if he would have conducted a GI study in the absence of abdominal pain. Tr. 886, 892. Notably, Dr. Gouge and Dr. Gabriel testified that there is a potential risk of ulcers incident to bariatric surgery, Tr. 491, 641, and the defendant stipulated that Jupiter had decubitis ulcers and that they were painful. Tr. 108. See also Dr. Mandell's testimony in this regard at Tr. 685-686. Assuming the very questionable assumption that the words "abdominal pain" are not to be found elsewhere in the voluminous medical record, the implication that its absence negates a gastric leak given the overwhelming evidence of its presence is meritless.

The defendant's charge of a failure to consider normal readings of temperature and white blood cells suggests that the plaintiff claimed a persistent fever and an abnormal elevation of white blood cells throughout Jupiter's stay at the defendant's hospital which is wrong and misleading. Temperature and white blood cell readings had no relevance except as to the plaintiff's claims of malpractice which were that Jupiter was negligently discharged from the defendant's hospital on two occasions when he had a high temperature and an elevated count of white blood cells. See M&O at 6-7.

    IV.    I misinterpreted Dr. Gouge's testimony.

If that allegation is meant to convey that my conclusion that Dr. Gouge's removal of Jupiter's distal stomach was malpractice was erroneously bottomed solely upon the

interpretation of Dr. Gouge's testimony set out on page 5 of my M&O, it chooses to ignore the findings leading to my conclusion clearly recited on pages 2-6 of that M&O.

    V.    I erroneously found the removal of Jupiter's distal stomach to be the proximate cause of his damages.

The causal relationship between the removal of Jupiter's distal stomach and his death was succinctly recited on pages 3 and 25 of my M&O.

A significant factor in that determination in favor of the plaintiff was the inexcusable failure of the defendant to have a CT scan done of Jupiter's abdomen. The relationship between that failure and Jupiter's subsequent decline is discussed on pages 15-19 of the M&O and not mentioned at all in the defendant's motion.

    VI.    The damages awarded are excessive.

    A.    <u>Award for pain and suffering</u>

My thoughts leading to that award are discussed on pages 28-34 of my M&O. I can add little to what I wrote there. A determination of whether such an award is or is not excessive is made by the application of a standard not capable of mathematical measurement or scientific precision. An award should be set aside, that standard requires, if it is disproportionate, inadequate, or shocks the conscience.

The defendant adamantly disputes the justification for the award for pain and suffering endured by Jupiter over a period of 2 ½ years. The ground upon which the defendant rests its challenge to that award appears to be random references to the absence of abdominal pain as negating a gastric leak alluded to and addressed above.

In its Memorandum in Support of its Motion, Dkt. No. 90 at 23-24, the government also lists 39 pages of that medical record in which progress note entries state that Jupiter was pain free. The misconception that listing invites is made apparent

on the same page 24 in which the government writes "During that entire time [at the Bronx VA Medical Center] . . . his pain was managed . . . first with morphine alone, then morphine supplemented by fentanyl patches of increasing strength, neurontin, ibuprofen and in the last months of his life, methadone. Many notes during this period establish that the administration of medication relieved Jupiter of pain." It follows that the management of pain and the relief of pain necessarily bespeaks the existence of pain.

Informative and relevant in this regard as well, is the concise and vivid description by Dr. Telzak of the course of Jupiter's condition from March 1, 2004 to the day he died on December 6, 2005, as one of "chronic and progressive neurologic and physical deterioration with five or six readmissions to acute care facilities for a variety of different infectious processes including urinary tract infections, various live infections, severe decubitis ulcers, chronic pain and progressive mental status deterioration." Tr. 217-218.

B. Award to children

The vigorous and deeply felt objection to that award voiced by the defendant upon the argument of this motion, June 14, 2013 Tr. at 41, moved me to re-examine it. That re-examination drives me to conclude that the award meant to compensate them for the loss of their father's guidance and support they would have enjoyed had he lived, was excessive and misinformed.

The court is the finder of facts in a bench trial. Those facts must be found in the trial record which is made by the sworn testimony of witnesses whose credibility is determined by the Court, and the exhibits received in evidence, the relevance of which are either readily apparent or explained during the course of the trial. The major exhibit

received in evidence on consent within the first hours of this trial was the already mentioned 6,000 page medical record marked A1-A6000, Tr. at 30-31. That exhibit designated simply as "A" can fairly be said to be a joint exhibit. Those pages were replete with medical shorthand notes, technical medical terminology, test scores and readings of scientific instruments not readily comprehensible by a layman who, without explanation, risks misunderstanding and misinterpreting them. Only those pages of that exhibit which were identified at trial and their significance for the issues in this case testified to by the medical experts on direct and cross examination formed the basis for the Court's findings of fact. The citation to countless pages of the voluminous medical record in the proposed findings of fact submitted by the parties, without more, did not serve that fact finding process.[2]

The only evidence in the entire trial record pertaining to the children's loss is their testimony on direct examination on pages 375-402 and 421-425. No questions were asked of either of them on cross-examination. The only one question asked on the direct examination of Mrs. Jupiter was whether her husband had a good relationship with their children, to which she replied "Yes, he did." Tr. at 407. The truthfulness of that response is impugned by her prior declarations, *infra.*

In the course of oral argument on this motion, defendant's counsel alluded to evidence in the record that would dramatically reveal that the deceased was not the father the children's testimony portrayed nor was his relationship with them good as

---

[2] Instructive in this regard are the cases in which, albeit in another context, courts have held that "The government did not fulfill its obligation by providing mountains of documents to defense counsel who were left unguided as to which documents would be proven" United States v. Bortnovsky, 820 F.2d 572, 575 (2d Cir. 1987). Analagously paraphrased, the government may be said to have left unfulfilled its assistance to the Court by leaving it unguided as to which of the 6,000 pages of the medical record would bear upon an award to the children. See also United States v. Giffen, 379 F. Supp.2d 337, 344 (S.D.N.Y. 2004).

8

found in the trial record nor was the Court's attention directed to that portion of the 6,000 page exhibit during the children's testimony which would have shed a different light on it. The evidence alluded to was referenced in the defendant's Memorandum in Support of its Motion and was found in Exhibit A5716-5853 of the medical record which I retrieved. Those 137 pages were made up of Dr. Brett Gorkin's (Jupiter's therapist) handwritten notes of Jupiter's visits between 1992 and 1999 and handwritten replication of those notes by Dr. Gorkin to the VA doctors as noted above. Most relevant and disturbing, however, were what appear to be reports by Mrs. Jupiter to Dr. Gorkin of her husband's behavior between 1990-1994.

Her earliest letter to Dr. Gorkin in 1990, describes her husband as a wonderful person who doesn't have a bad bone in his body. A5746. As her reports progress, however, they portray a man whose sense of personal hygiene was unimaginatively abandoned and whose behavior was indescribably bizarre. As pertaining to the relationship with his children, she repeatedly reports that he never spends quality time with them, has no relationship whatsoever with his son towards whom he is occasionally verbally abusive. A5746-5765. His therapist noted in 1999 that he "does little in his role as a father." A5778. That exhibit also conveys an indifferent employment history and financial irresponsibility as regards his family's welfare as evidenced by his propensity for gambling. A5788. That portrait of Warren Jupiter is not even suggested from the transcript of the trial record. I believe that defense counsel's commendable sense of decency and sensitivity deterred him from trumpeting those disquieting facts on the record in open court, but left it instead to a reference to a numbered page of a voluminous record in a written submission.

The relationship between Jupiter and his children during those formative years as described in Dr. Gorskin's reports and in the letters to him by Mrs. Jupiter, were written at a time when there was no thought that they might one day be testimonial and thus stamps them with an indelible mark of credibility. It is significant to note, however, that the last of the reports from which the foregoing was taken was dated 4/23/99, A5793. In that report, Dr. Gorkin wrote that Jupiter's relationship with his children "was more quiescent than in years past" and "his relationship with his son from whom he has been largely estranged has even seemed to improve." A5796.

A review of the testimony of his son who, when asked about his memories of his relationship with his father "starting from a young period," replied "we had a good father-son relationship," read against the backdrop of Dr. Gorkin's reports of that "young period" would reflect badly upon his credibility or at the very least, his memory. His uncontested testimony, viewed in its entirety however, warrants a finding that in his later adolescent years and thereafter, he did have a good relationship with his father whose guidance he valued and would have enjoyed had he lived.

There is no information in the record about Jupiter's relationship with his children during the four years prior to his surgery. The evidentiary inference of continuity,[3] that is, that the fractured relationship with them as described in Dr. Gorkin's reports continued, is too tenuous to draw given Dr. Gorkin's last note of 4/23/99.

Children may be compensated for the loss of nurture, care and guidance their father would have provided had his death not been wrongfully caused. That loss must be measured in "pecuniary" terms, in dollars and cents, the pricing of which is obviously

---

[3] See, e.g., McFarland v. Gregory, 425 F.2d 443 (2d Cir. 1970); Kirshtein v. American Credit Union, 83 A.D. 3d 153 (4th Dept. 2011).

impossible in significant part, I would suggest, because those words are not easily defined with any precision. They cannot be compensated for the grief suffered and the companionship lost by the wrongful death of their father. It follows that the award that can be made to them must be arbitrary and predictive. Arbitrary in the sense that "nurture" and "guidance" have no intrinsic value that can be weighed or assayed as precious metals or by the economic laws of supply and demand. The factors that have some certainty and relevance in making such an award are the ages of the children at the time of the parent's death; his life expectancy; the history of the relationship between them while he lived, provided by the evidence elicited during the trial. That history would be provided by the evidence of such things as the material support provided his children while he lived; the quality, and for the want of more descriptive words, the texture, the emotional, social, intellectual essence, inherent in that relationship that the evidence informs the common understanding of what "nurture" and "guidance" means.

The reference to innumerable decided cases in which awards were made for nurture and guidance to provide the parameters of such awards as guidance for the court, is of little, if any, value. What other case even remotely mirrors this one in every respect relevant to the making of this award? To ask the question is to answer it and the answer is why, in every real sense, such an award is arbitrary and predictive.

The facts that are certain are that the children were 16, 19 and 21 when their father died. His life expectancy was 12 years. The historical evidence was that he was not a provider of meaningful financial support to his children who were 14, 17 and 19 when he was operated on in 2003. The historical evidence in the record requires the sad conclusion that during that period, the "texture," the intangible essence of his relationship with his children provided little of nurture and guidance. The relevant

11

period, however, for purpose of such an award is the time of death. As is stated above, there is a dearth of information regarding their relationship after 1999. The record thereafter consists entirely of the brief observation by Dr. Gorkin in his note of 4/23/99 that Jupiter's relationship with his children was "more quiescent than in years past" and that his relationship with his son "seemed to improve," and the uncontested testimony of his children. Their testimony conveyed little of substance as regards nurture and guidance and consisted for the most part of the physical deterioration of their father and the quality of the care he was receiving. Notable, however, was the devotion and concern for him they manifested throughout the more than two years of his hospitalization. They visited him faithfully and frequently and ministered to his every want when they were with him. That devotion to and concern for and biblical honor they paid to their father bespeaks a relationship that was by then a loving and meaningful one. His son's testimony lent credence to Dr. Gorkin's observation and warranted a finding that there was a meaningful relationship between them reflecting shared interests and guidance which he valued.

That testimony may justifiably warrant the prediction that had Jupiter survived his operation and at long last be freed from the myriad social, economic, emotional and personal disadvantages and embarrassments obesity most surely imposed, the twelve years of life that would have remained to him would have been years during which his children would have enjoyed the guidance and parental nurture and succor of which they were deprived by his wrongful death.

I am conscious of the plea made by Oliver Cromwell to the Church of Scotland in 1650 that Learned Hand believed should be engraved over the portals of every courthouse in the land, viz.: "I beseech ye in the bowels of Christ, think that ye may be

mistaken." Dillard, The Spirit of Liberty XXIV (1952). I have thought and I was mistaken. The award I made to the children was egregiously excessive and is hereby modified by awarding each child the sum of $50,000.00. As so modified, the defendant's motion is granted and in all other respects, it is denied.

SO ORDERED.

Dated:    Brooklyn, New York
          August 14th, 2013

                                                       _____
                                                       I. Leo Glasser